IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

January 4, 2017 Session

## STATE OF TENNESSEE v. ARTHUR GRAHAM and MICHELLE GRAHAM

**Appeal from the Criminal Court for Shelby County**
**No. 10-05643     Glenn Wright, Judge**

_____

### No. W2015-02410-CCA-R3-CD

_____

The Defendants, Arthur and Michelle Graham, were indicted on August 31, 2010, for theft of property valued at $60,000 or more from the State of Tennessee based on their fraudulent medical billing practices at the children's therapy facility they owned and operated, which resulted in overpayments in excess of $200,000.  According to the indictment, the thefts occurred between March 6, 2002, and October 31, 2003.  The delay in indicting the matter resulted from the fact that the United States Attorney's Office had first investigated the thefts and did not release the matter to the Shelby County District Attorney General's Office until the applicable federal statute of limitations had run.  The Defendants each filed a motion to dismiss the indictment, claiming their rights to a speedy trial had been violated by the pre-indictment delay.  The trial court denied the motions. Subsequently, the Defendants filed a joint motion to reopen proof on their earlier motions to dismiss.  The court entered an order granting in part and denying in part the motion.  While the court held that the Defendants had failed to present proof of actual prejudice between the last alleged criminal act and the return of the indictment, it found that the eight-year statute of limitations had run as to the thefts alleged to have occurred prior to August 31, 2002.  As a result, the State could proceed only as to those thefts occurring between August 31, 2002, and October 31, 2003.  The Defendants then filed a joint motion, asking that the court reconsider its earlier order, again asserting the pre-indictment delay violated their rights to a speedy trial.  After hearing the testimony of witnesses, the trial court reversed its previous order, this time finding that the Defendants had been prejudiced by the pre-indictment delay, and dismissed the indictment.  The State appeals this order.  As we will explain, we reverse this order of the trial court and reinstate the indictment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Indictment Reinstated**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Byron Winsett, III, Assistant District Attorney General, for the appellant, State of Tennessee.

Lance R. Chism (on appeal) and Paul Springer (at hearing), Memphis, Tennessee, for the appellee, Arthur Graham. Jennifer J. Mitchell, Memphis, Tennessee, for the appellee, Michelle Graham.

## OPINION

In our review, we first will detail the motions made on behalf of the Defendants regarding the delay in the indictment.

On June 15, 2012, the Defendants filed a joint motion to dismiss the indictment, claiming that the statute of limitations had run as to the offenses. On April 14, 2014, counsel for Defendant Arthur Graham filed an amended motion to dismiss the indictment, arguing that Mr. Graham had been denied his right to a speedy trial because of the passage of time between the offenses alleged in the indictment and the date of the indictment. Shortly thereafter, counsel for Defendant Michelle Graham filed a like motion. Both motions asserted that this passage of time affected the Defendants' abilities to defend themselves. The trial court took both motions under advisement. On July 24, 2014, the trial court heard arguments from the parties and advised that a ruling would be issued on August 21, 2014.

On August 11, 2014, the Defendants filed a joint motion asking that the court allow them to reopen proof on the previous motions to dismiss. On August 15, 2014, the court heard testimony, as we will set out, from retired Tennessee Bureau of Investigation (TBI) Special Agent Roger Turner regarding the investigation of the matter and history of the delays. The State filed a response on October 7, 2014, opposing the motion. The court entered an order granting in part and denying in part the motion on November 12, 2014. In that order, the court denied the Defendants' claims regarding the violation of their Sixth Amendment and due process rights but granted the motion as to the statute of limitations, meaning that the State could not proceed on offenses alleged to have occurred prior to August 31, 2002.

On March 26, 2015, the Defendants filed a joint motion, asking that the trial court reconsider its previous order. At a hearing on June 25, 2015, the trial court heard

additional testimony from Defendant Arthur Graham and then, on July 30, 2015, from Alonzo Chad Pendleton, Tarlene Whooper, and Myla Johnson. On November 10, 2015, the trial court filed its order granting the Defendants' motion to dismiss the indictment.

At the evidentiary hearing, which preceded the trial court's dismissal of the indictment, several witnesses testified. Roger Turner said that he was a retired special agent of the TBI and had been assigned to the Medicaid task force.[1] While in that position, he participated in a 2003 investigation of the Defendants' business, Cuddles Care Services, LLC. The criminal investigation resulted from a complaint filed by Blue Cross Blue Shield that Cuddles Care was improperly billing physician codes and had been paid more money than it was entitled to. The investigation began on August 13, 2003. According to his investigative summary, Mr. Turner received a letter on October 27, 2003, from Myla Johnson with Omnicare, stating that Omnicare had reached a contractual agreement with Cuddles Care to recover $15,665.07 identified as overpayments due to fraudulent billing. Mr. Turner continued with his background investigation of the complaint, interviewed potential witnesses, investigated the business and, on September 21, 2004, served a subpoena for the United States Attorney's Office on Kathy Yancey, the bookkeeper in charge of billing for Cuddles Care. On December 8, 2004, Mr. Turner met with Ms. Yancey and George Graham, the registered agent for the business and uncle of Defendant Arthur Graham.

On May 2, 2005, Mr. Turner received a Chapter 11 bankruptcy petition filed by George Graham on behalf of Cuddles Care. The investigation continued, as Mr. Turner interviewed physicians who were shown to have treated the patients in question, caused subpoenas to be issued for financial records, and attended meetings at the United States Attorney's Office. On January 25, 2006, Mr. Turner was present at a meeting at the United States Attorney's Office when George Graham, who had been acting as Defendant Arthur Graham's attorney, was advised that he should end that representation and retain an attorney because he might have liability himself. On August 11, 2006, Defendant Arthur Graham and his new attorney, Sam Perkins, met with an Assistant United States Attorney to discuss the matter. On May 8, 2007, the Defendants appeared before a federal grand jury, as did Kathy Yancey. On November 13, 2007, Tonya Ruff, a former billing clerk for Cuddles Care, appeared before the federal grand jury. Mr. Turner interviewed Ms. Ruff on November 30, 2007. He met with a different Assistant United States Attorney on September 11, 2008, because the attorney who previously had been handling the matter was transferred to another position and the one to whom it was newly assigned was becoming familiar with the investigation, which slowed it down. Within a few weeks, the new attorney determined that the relevant federal statute of limitations

---

[1] During Mr. Turner's testimony, he referred to his narrative of the investigation, which was dated November 14, 2007, and provides a more detailed description than Mr. Turner testified to. His report was admitted as an exhibit and is included in the record on appeal.

had run. So, on October 29, 2008, the case was presented to the State Attorney General's Office for a possible civil proceeding to try to recover some of the State's funds and then to the Shelby County District Attorney General's Office in September 2009 after new violations had been discovered. Mr. Turner did not know why the State waited until August 2010 to present the case to the Shelby County Grand Jury.

Defendant Arthur Graham testified that he had been part owner of Cuddles Care Services, which he and his wife started in 2001 or 2002. The business was created to provide therapy services for children with disabilities, with payments coming from state-funded medical insurance, primarily Omnicare, Better Health Plans, Tenn-Care Select, and Blue Cross Blue Shield. He explained that each of those companies required that his therapists be credentialed, meaning that he had to submit paperwork showing the therapists he would be working with, as well as his business license and certification through Jayco, which, apparently, provided the inspection process necessary for Cuddles Care to be accepted by the State of Tennessee to receive payments from its managed healthcare plan. Cuddles Care employed certain employees with licenses, which included occupational, physical, and speech therapists but no physicians.

Immediately upon beginning Cuddles Care's services, Mr. Graham was advised by Better Health Plans, Omnicare, and Tenn-Care Select that the bills submitted by Cuddles Care did not have the correct provider information and could not be approved. So, he hired a medical coder, Tonya Ruff, to help with billing procedures. After she began working, Mr. Graham received a notice from Omnicare, in 2004 or 2005, that they should stop using a certain billing code that was reserved for physicians. Mr. Graham met with representatives from Omnicare and was told that they were not authorized to use codes that were reserved for physicians and that they could use only certain codes. Ms. Ruff told Mr. Graham that a therapist could be considered a healthcare provider, and he overheard her discussing this with Omnicare and Better Health Plans. They were provided a new contract, which listed the only codes they could use and set up a repayment plan to pay back some of the sums they had not been entitled to receive.

Shortly after Cuddles Care had started making the repayments, it encountered problems paying state and federal taxes; so, the company filed a Chapter 11 bankruptcy petition. Soon after that, Mr. Graham was notified by the TBI that a criminal investigation was being opened and that its agents would be seeking files and records from the business. After later receiving the subpoena, Mr. Graham took the records to the TBI himself. Shortly after that, Cuddles Care closed, and Mr. Graham heard nothing from the TBI for "about another three years." Then, he learned that the State Attorney General's Office wanted some records in addition to those he had provided to the United States Attorney's Office. Another two years passed without him hearing anything from the State, and in 2010 he was taken into custody on the indictment. He earlier had

-4-

spoken with Chad Pendleton and Tarlene Whooper at Omnicare, but he later was unable to contact either of them.

On cross-examination, Mr. Graham said that he had owned two businesses, Cuddles Child Care Service and Cuddles Care, both of which he started with his wife. His wife was a therapist, but he was not. Kathy Yancey, his cousin, worked as a medical billing clerk. Their daycare director was Kim White. Mr. Graham said that he attended a class, taught by Tonya Ruff, to learn "basic knowledge" of medical billing. He started the class after Omnicare had denied several of their billings because they were not filling out the forms properly.

Alonzo Chad Pendleton testified that he currently was employed by Humana but previously had worked for Omnicare. He said that he had no recollection of having met with the Defendants regarding incorrect billing or coding practices. He said that he no longer had access to Omnicare records and that it no longer was in business. He did not teach healthcare providers how to bill their services, only how to submit bills to Omnicare. He said that there was no reason for a healthcare provider, which had no physicians associated with it, to bill for physician services. Only physicians could bill for their services. If a healthcare provider had no physicians associated with it, he never would have instructed the provider to bill Omnicare. He said that he was not a coding expert and would never have told a provider to use a certain billing code. If a provider claimed to employ physicians, he would check to if there were any exclusions or sanctions that would prevent them from practicing or any pending malpractice suits. If he determined that providers had been overpaid for services, he would set up a repayment schedule. He did not remember whether he had worked with the Defendants on such a plan.

Tarlene Whooper testified that she was employed by Omnicare from 1997 until 2008, as best she could remember. She was a senior provider relations advocate, serving as a liaison between the company and the providers. Ms. Whooper said that she had no memory of meeting with the Defendants. If a provider contacted her and asked if their company should use one billing code or another, she could not answer the question because she was not a coder. She did not deal with specific claims, for they went to other Omnicare personnel. She did not recall ever working with any therapy groups, but mostly primary care and specialty physicians groups. She was not involved with claims for payment and would not have attended a meeting regarding such claims, unless asked to do so. Ms. Whooper did not recall attending a meeting regarding a therapy group and did not believe it was possible that she had done so. She never provided advice to any type of group as to which billing codes to use, for she was not a certified coder. As to Defendant Arthur Graham, Ms. Whooper said that she did not "even know who Mr. Graham" was.

Myla Johnson testified that she had been employed by Omnicare as vice-president for health services from October 2002 until July 2008, leaving the business shortly before it closed. Ms. Johnson described her duties with Omnicare: "My main focus was review of the hospital care being provided to our members. Setting up discharge services for our members. Doing prior authorization for outpatient services. Early and periodic screening for children. And then I was the fraud and abuse representative." Her duties also included preventive screening for children with physical disabilities, who were to receive physical therapy. It was "possible" that she came in contact with providers for these children. If she did so, she would take notes regarding the meeting, but she did not have access to such records.

During cross-examination, Ms. Johnson said that she had been the fraud and abuse representative for the plan and worked with the TBI to report any potential fraud. She did not recall any groups that provided both therapy and physician services. If Omnicare suspected that a provider was engaging in fraud, she would report the matter to the TBI. As for billing questions from providers, she would refer the provider to someone who was an expert in billing and coding. She did not recall ever being in a situation in which Omnicare provided advice as to billing procedures. Omnicare had a contract with a claims processing company to process claims, but she did not know if that company provided billing advice to providers. She did not refer providers with billing questions to that company for assistance. Her instructions were that, if she suspected fraud in a provider's billing practices, she should contact the TBI but not the provider.

## ANALYSIS

On appeal, the State argues that the Defendants did not establish that their rights to a speedy trial or to due process were violated and that the trial court erred in finding that they had been. Additionally, the State argues that the trial court erred in concluding the State could not prosecute offenses occurring prior to August 31, 2002.

In its supplemental order granting the Defendants' motion to dismiss based upon violation of their rights to a speedy trial, the trial court explained that, in first denying the motion, the court had determined that the Defendants established three factors in their favor: unreasonable lengthy delay, absence of a valid reason for the delay, and assertion of speedy trial rights. However, the trial court did not find that the Defendants had been prejudiced by the delay. Following the trial court's later hearings, the testimony which we have set out in this opinion, the court noted that the witnesses testified that they could not remember conversations or written correspondence from over ten years ago and that evidence of these communications would have established a defense to the criminal charges. Relying upon the opinion of this court in State v. Hudgins, 188 S.W.3d 663, 668

(Tenn. Crim. App. 2005), the trial court explained that because of the nearly eight-year delay and the testimony of witnesses "that they could not remember the facts and circumstances surrounding the events in question," the Defendants' speedy trial rights had been violated.

The State appealed this order; and, for reasons which we will explain, we reverse the order of the trial court and direct that the indictment be reinstated as to both Defendants.

In our analysis, we first note that the Defendants' specific speedy trial claim is not that the State delayed trying the indictment against the Defendants but, rather, that the State delayed indicting them.

As to when the right to a speedy trial attaches, Tennessee follows the majority rule, which is that the right does not arise until a defendant is either indicted or arrested:

> [T]his Court has determined that a warrant alone does not trigger speedy trial analysis; to the contrary, a formal grand jury action or the actual restraints of an arrest are required. Wood, 924 S.W.2d at 345; Baker, 614 S.W.2d at 353. We have followed [United States v.] Marion's [404 U.S. 307, 320 (1971)] lead, reasoning that it is at this stage of arrest and grand jury action that the significant interests served by the right to a speedy trial are most directly implicated: the protection against oppressive pre-trial incarceration and the reduction of anxiety and concern caused by unresolved charges. See Marion, 404 U.S. at 321-22, 92 S. Ct. at 463-64.

State v. Utley, 956 S.W.2d 489, 493 (Tenn. 1997).

Thus, the Defendants' speedy trial rights did not begin to run until 2010, when they were indicted and arrested following the return of their state grand jury indictment. Accordingly, the Defendants' speedy trial rights were not violated by the length of time between the initiation of the investigation and the return of the indictment.

As our supreme court further explained in Utley, "as we and other courts have recognized, a defendant has other protections during delays prior to arrest, in particular, the applicable statute of limitations and the right to due process." Id. Additionally, our supreme court explained the proof required to establish a pre-indictment due process claim, saying that, as well as prejudice to a defendant, "the due process inquiry under Marion also requires proof regarding the State's use of the delay to gain tactical advantage." Utley, 956 S.W.2d at 495. At the evidentiary hearing conducted in this matter by the trial court, the Defendants made no effort to show that the delay in

-7-

returning the indictment was engineered so the State could gain a tactical advantage. Rather, the proof showed that the matter was being reviewed by the United States Attorney's Office until the applicable federal statute of limitations had expired. It was only at that that time that the Shelby County District Attorney General's Office was presented with the case as well as the records. Thus, since the Defendants failed to show that the State engineered the delay, they failed to establish that their due process rights were violated pre-indictment. Accordingly, we reverse the order of the trial court and direct that the indictment be reinstated as to both Defendants.

### Joinder of Offenses/Statute of Limitations

In its initial order, the trial court held that the applicable statute of limitations had run as to any offense occurring prior to August 31, 2002. The State appealed this determination as well, even though the court later dismissed the indictment in its entirety.

Pursuant to the holding of our supreme court in State v. Byrd, 968 S.W.2d 290, 291 (Tenn. 1998), the State is permitted to aggregate the thefts into a single indictment where "separate larcenous acts are: (1) from the same owner[s]; (2) from the same location; and (3) pursuant to a continuing criminal impulse or a single sustained larcenous scheme." In this matter, since the thefts all were from the same victim, the State of Tennessee, occurred from the same location, and were done pursuant to a continuing criminal impulse or a single sustained larcenous scheme, aggregation was proper. This being the case, there was not a separate statute of limitations as to each act, but, rather, the statute as to all offenses ran from the last act in the series. State v. Robert Dewayne Criswell, No. 01C01-9804-CR-00163, 1999 WL 228795, at *2 (Tenn. Crim. App. Apr. 21, 1999). Accordingly, the State may prosecute all of the offenses alleged in the indictment.

### CONCLUSION

Based upon the foregoing authorities and reasoning, we reverse the order of the trial court, reinstate the indictment, and remand for further proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE

-8-